MORRISON INCORPORATED; MORRISON CAFETERIA COMPANY OF SAVANNAH, INCORPORATED; MORRISON CAFETERIA COMPANY OF WOODLAND HILLS, INC.; MORRISON INCORPORATED OF TENNESSEE; MORRISON CAFETERIA COMPANY, INC.; MORRISON CAFETERIA OF COLUMBIA, SOUTH CAROLINA, INC.; MORRISON CAFETERIA COMPANY OF JEFFERSON PARISH, INC.; MORRISON SUPPORT COMPANIES OF GEORGIA, INC.; MORCO INDUSTRIES, INC. (FORMERLY MORRISON SUPPORT COMPANIES OF FLORIDA, INC.) AND MORRISON FOOD SERVICES OF VIRGINIA, INC., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Morrison, Inc. v. Commissioner
Docket No. 34300-83.
United States Tax Court
T.C. Memo 1986-129; 1986 Tax Ct. Memo LEXIS 481; 51 T.C.M. (CCH) 748; T.C.M. (RIA) 86129; March 31, 1986. Thomas W. Power and Tracy J. Power, for the petitioners. Robert W. West, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income taxes in the amounts and for the years as follows: Petitioners
Year Ending
Deficiency
Morrison Cafeteria Company of
May 28, 1977
$4,204.40
Columbia, South Carolina, Inc.
June 3, 1978
19,164.50
Morrison Cafeteria Company of
May 31, 1975 [1]
9,144.00
Jefferson Parish, Inc.
May 28, 1977
127,407.82
June 3, 1978
14,389.50
Morrison Support Companies of
May 28, 1977
1,259.80
Georgia, Inc.
June 3, 1978
4,455.61
Morco Industries, Inc.
June 3, 1978
3,486.40
(Formerly Morrison Support
Companies of Florida, Inc.)
Morrison Food Services of
May 31, 1975 [1]
5,313.53
Virginia, Inc.
May 28, 1977
6,471.00
Morrison, Inc.
May 28, 1977
142,929.00
June 3, 1978
138,248.24
Morrison Cafeteria Company of
May 28, 1977
4,140.40
Savannah, Inc.
June 3, 1978
3,653.00
Morrison Cafeteria of
May 28, 1977
14,273.20
Woodland Hills, Inc.
June 3, 1978
39,468.70
Morrison Incorporated of
May 28, 1977
7,874.18
Tennessee
June 3, 1978
28,075.00
Morrison Cafeteria, Inc.
May 28, 1977
158.60
June 3, 1978
13,521.71
*482 Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision only whether petitioners are entitled to investment taxs credits granted by section 38 [2] for any or all of 19 categories of assets that were purchased and installed in cafeterias constructed by petitioners during the fiscal years ending May 28, 1977 and June 3, 1978, and a portion of the costs of the primary electrical distribution systems installed in their caeteria buildings during these years. [3] *483 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners consist of Morrison, Inc., and nine related corporations. [4] The principal place of business of each petitioner was Mobile, Alabama, at the time the petition in this case was filed. Petitioners filed their original and amended Federal corporate income tax returns for the years in issue with the Internal Revenue Service Center, Atlanta, Georgia. Petitioner, Morrison Inc., is the parent corporation *484 of the remaining petitioners. During the years at issue, petitioners owned and operated several diverse businesses, but their primary business was the operation of public cafeterias. The corporation began in 1920 with the opening of the first cafeteria in Mobile, Alabama. The business has grown so that by May 1977 it included 101 cafeterias and by June 1978 included 117 cafeterias. Over the years Morrison Inc. has organized or acquired subsidiary corporations to provide food to the cafeterias, roast and grind coffee, manufacture cleaners and detergents, supply food service equipment, manufacture furniture and kitchen equipment, supply interior accessories and decorations, build cafeterias, provide insurance for cafeterias and provide advertising services. Petitioners offer in excess of 100 menu items to the public each day, including numerous items in the categories of appetizers, salads, soups, entrees, vegetables, fruits, breads, desserts and beverages. Petitioners receive volume shipments of food products, including raw food products such as dressed turkeys and chickens and frozen and fresh vegetables. Petitioners uncrate and unpackage the food products and prepare them for *485 public consumption by cooking, frying, baking or broiling. Petitioners are subject to all applicable local health codes and regulations governing the operation of restaurants. These codes and regulations are in addition to those which govern businesses and buildings generally and may set standards or guidelines for preparation and cooking of food, cleanliness, sanitation, employee dress and other related areas. Before a restaurant can open to the general public, a certificate of occupancy must be issued which certifies compliance with all relevant codes and regulations. Continuous compliance is also insured by frequent unannounced inspections by public health officials charged with the enforcement of such codes and regulations. Emergency Lighting.
Emergency lighting consists of lights, batteries, and connections to a building's electrical system. Both wall-mounted and ceiling-mounted models were used by petitioners. The emergency lights were constructed so that their batteries were continuously charged by the building's electrical system and when electrical power was interrupted, the lights would automatically switch to battery power and be turned on. The lights were *486 designed to illuminate large areas of the cafeteria during electrical power failures so customers are able to finish eating their meals during a power outage. In petitioners' cafeterias customers pay for their meal after eating when they exit the cafeterias. The use of emergency lighting in cafeterias is required by the health and safety codes of each State in which petitioners operate, and the number of emergency lights required is based upon the seating capacity and square footage of the cafeteria. Petitioners' cafeterias may require more emergency lights than a retail store such as a furniture store would require, but each of petitioners' cafeterias had more than the required number of emergency lights. Emergency lights located in the dining rooms were ceiling-mounted models, and wall-mounted models were generally confined to the kitchen. In petitioners' Williamsburg facility, there were 16 emergency lights in the dining room and 3 in the serving line area which would be considered ceiling-mounted models. There were six emergency lights in the kitchen area which would be considered wall-mounted models. The ceiling- or wall-mounted models could be self-contained units that *487 were plugged into a normal electrical outlet but the majority were wired directly to the building's electrical system. Kitchen Panel Boards.
Kitchen panel boards are electrical panel boxes containing circuit breakers that are used to distribute electrical power to the kitchen equipment, but not to lighting, cooling or heating facilities in petitioners' cafeterias. The kitchen panel boards receive electrical power from lines connected to the main panel boxes for each cafeteria (which in turn receives power from outside lines) and distribute power to the kitchen equipment, electric water cooler and wall receptacles through lines connected to the output circuit terminals. The output circuits are graded by size of amperage to conform to the needs of the various pieces of kitchen equipment. The circuits from the kitchen panel boards provide power to kitchen equipment both through direct connections to larger equipment and through wall receptacles. Some circuits to larger equipment have in-line switches between the equipment and the kitchen panel boards to allow interruption of electrical power if necessary. The kitchen panel boards are placed in the cafeterias during the construction *488 of a new cafeteria. The circuits in the panel board may be modified from time to time as electrical requirements dictate. Each circuit running from the kitchen panel boards supplies electricity to one piece of kitchen equipment. Each circuit leads from a panel board to a specific piece of equipment and back to the panel board. A panel board has room for installation of many circuits. Each circuit requires a circuit breaker to be installed in the panel board and wires lead from the circuit breaker to the equipment. In order to change a circuit or to change minimally the circuit's capacity, a simple change of the circuit breaker on the panel board is necessary. A change from 15 amps to 20 amps is a minimal change that can be accomplished in approximately 5 minutes. In order to increase the power from 15 amps to 50 amps, however, the original conduit must be abandoned, a new conduit must be rerouted and new conductors must be run through it. Panel boards are standard electrical equipment and are not designed and purchased especially for specific machinery or equipment. Panel boards can be used and adapted to supply electricity to almost any type of electrical appliance or equipment. *489 The kitchen panel boards in issue constitute approximately 50 percent of petitioners' total expenditure for panel boards. Kitchen Hand Sinks.
Petitioners provide one or more hand sinks in the kitchen areas to facilitate the washing and cleaning of employees' hands during working hours. The number and location of these sinks are generally determined by local health codes and regulations. Local health codes prohibit employees from washing their hands in the food preparation sink. The sinks in issue are connected to the general plumbing of the building and to the sanitary sewer. The sinks are constructed generally of stainless steel and have large control handles capable of being operated by the employee by using only his elbows or feet. The kitchen hand sinks are part of the original design of a new cafeteria and are placed in use when the cafeteria opens. The kitchen hand sinks are bolted to the walls of the kitchen and are connected to the building's water and sanitary sewer system. If a cafeteria is closed, the kitchen hand sinks are normally removed from the wall by disconnecting them from the water supply and sanitary sewer. Kitchen Water Piping.
The kitchen *490 water piping is designed to deliver clean water to various equipment located in the kitchen area and the food serving line. The kitchen water piping also delivers water to the kitchen hand sinks and electric water coolers. The kitchen water piping is described as the piping which branches off of the main water lines of the building and brings water to the kitchen area and food serving line. The kitchen water piping is connected to sinks, water coolers nd various items of equipment requiring water for operation. The kitchen water piping connects to equipment used for the following purposes: (1) Cleaning and rinsing produce. (2) Cleaning, soaking and rinsing meat, fish and other meat products prior to cooking. (3) Preparation of food. (4) Cleaning of employees' hands in kitchen hand sinks. (5) Cleaning of pots, pans and other utensils. (6) Ice machines. (7) Drinking fountains. (8) Cleaning of kitchen equipment and kitchen area. The kitchen water piping is installed during the construction phase of a new cafeteria but may be modified with the introduction of new equipment requiring a water source. Once construction is completed, the only visible portion of the piping *491 is that portion which extends to connect with a sink, water cooler or other equipment. The remainder of the piping is buried below the cafeteria's concrete and tile floor or behind the gypsum board walls. The kitchen water piping leads to specific equipment. If petitioners' kitchen equipment were replaced or changed, petitioners could use the same water lines for the new equipment. Eliason Doors.
Eliason doors are double-action doors installed between the serving line area and the kitchen area. This door is self-closing and lightweight so that employees may open and close the door while carrying food trays in their hands. The doors have a glass panel inset and swing open in area and the serving line area. The doors are purchased by petitioners as a package containing the door, hinges and centering device. Petitioners furnish the door frame separately. Restroom Accessories.
Restroom accessories include paper towel dispensers, electrical hand dryers, cup dispensers, purse shelves, toilet tissue holders, stainless stell soap dispensers and holders, sanitary napkin dispensers and waste receptacles, coat hooks, bars for the handicapped, framed mirrors with shelves *492 and ashtrays. All of these items are not found in all restrooms. These items are either built into or fastened onto the restroom walls or metal partitions at the time the building is constructed, but may be replaced or modified at a later time. These restroom accessories are the type of accessories generally found in any public restroom. The restroom accessories are in both the customer and employee restrooms of the cafeterias. Petitioners have not removed any of the accessories in issue from the restrooms while the restrooms are in operation, unless the removed item is replaced with another similar accessory. The restroom accessories are attached to the restroom's tile wall either by drilling a hole in the wall and using a toggle bolt to bolt the accessory to the wall, or a space is provided for the accessory when the wall is constructed and the accessory is later installed in the space provided. Decor Window Treatment.
The decor window treatment consists of a false window built into an interior wall. A light fixture is mounted flush on an interior wall and is covered with a translucent lens. The fixture is then framed in and finished with millwork to resemble a window. *493 The decor window treatment is designed to simulate a window and not to provide the customer with lighting. The decor window treatment is constructed during the initial construction phase of a new cafeteria. It would be possible to remove decor window treatment and reuse it in a subsequent cafeteria location. Construction of decor window treatment on an interior wall was accomplished by framing in the window out from the wall with only the lighting fixtures recessed into the wall. If the window treatment was constructed on an exterior wall, it was constructed on top of the surface of the wall and was built to resemble a frame protruding out from the wall. When petitioners redecorated a cafeteria every 5 years, they often eliminated or changed the decor window treatment. Lattice Millwork.
The lattice millwork consists of decorative panels made with lattice material approximately 1-3/8 inches X 1/4 inch secured together at right angles that form a diamond shape design. The lattice gridwork was often placed over a wall which is covered with decorative wall coverings in order to simulate an outside garden. The lattice millwork could also be installed between two stationary *494 upright partitions in order to produce a screen between two dining areas. Portions of the lattice millwork were removed, repainted and reused by petitioners in another location when a cafeteria was closed or redecorated. Vanity Cabinets and Counters.
The vanity cabinets and counters are constructed in restrooms to provide an area for a customer's personal grooming. The vanity cabinets and counters at issue in this case are those provided for petitioners' customers rather than their employees. Petitioners used two types of vanity counters and cabinets in their restrooms. One type was a countertop braced or bracketed to the wall of the restroom and covered with a laminated plastic top. The second type was a full cabinet, placed on the restroom floor and bracketed to the restroom wall. Both types had cutouts for insertion of sinks. The vanity cabinets and counters were constructed by a cabinet maker during the final construction stage of the cafeteria. The cabinet was like any other cabinet found in many public restrooms. The counter was constructed from a two-by-four wood frame, covered by plywood, and was finished with a plastic laminate coat. Customer Line Screen.
*495 The customer line screen is the divider that separates the dining room area from the customers waiting to enter the serving line. Typically, this divider begins near the entrance door and runs along one side of the cafeteria to the serving line in the rear of the cafeteria. Framed openings are usually constructed within the customer line screen to eliminate the tunnel-line appearance of a long hall. Lattice work, spindles, or another open divider are constructed within the framed openings. The entire divider is constructed in the initial construction phase of a new cafeteria. It is usually anchored to the floor and ceiling by screws or nails. The portion of the customer line screen not constituting the framed openings is constructed using wood or metal studs, plates and blocking, and is covered with gypsum wallboard (sheetrock), plywood, paneling or other material. The wallboard or other covering may itself be covered with wallpaper or other decorative covering, such as vinyl, fabric or brick veneer, stain or paint. Portions of the customer line screen were often removed and reused by petitioners at other locations. Serving Line Concrete Curb.
The serving line curb *496 is a concrete curb that runs the full length of the serving line, wrapping around the end of the serving line and running partially in the rear of the serving line. The curb is a built-up concrete curb covered with a grouted quarry tile veneer. The curb is constructed during the initial construction phase of the cafeteria and it prevents water and spills from behind the serving line from reaching customers in front of the line and it aids in cleaning the floor. The curb also conceals legs and open space under the serving line steam tables and other equipment. Neither the serving line tables nor the equipment rests on the serving line curb. Such equipment is all freestanding. It is not practical to move a serving line concrete curb because of its construction. A new curb will be built in another cafeteria if petitioners close or sell an existing cafeteria. Serving line concrete curbs are similar, although not identical, to those found in meat markets and grocery stores under counters displaying products for sale. Kitchen Heat Recovery Unit.
The kitchen heat recovery unit reduces the cost of heating water for petitioners' cafeterias by collecting heat from the air conditioning *497 system and refrigeration units and using it to preheat cold water to about 110 to 120 degrees before it goes into the cafeteria's hot water heater where it is boosted to 140 or more degrees. Heat is collected, transferred and released by use of a closed-loop, water heat exchange system. This system preheats cold water in a storage tank that has been filled from the municipal water system. The kitchen heat recovery unit is used in conjunction with the cafeteria's plumbing system in providing hot water for kitchen equipment such as the pot sink and dishwasher. The heat recovery system makes efficient use of hot gases which would otherwise be wasted by using such gases to heat water. The kitchen heat recovery unit is installed with a series of pipes connecting the cold water source, a storage tank and the hot water heater. It also has a series of pipes connecting the air conditioning and heating unit from which it draws the hot gases. Due to the method of installation and the pipes running in the walls, floor and ceiling of the cafeteria, the heat recovery unit is difficult to remove, although it is possible to move the exposed components. The hot water heated by the heat recovery *498 unit generally is used in the public and employee restrooms as well as for cooking and cleaning functions, although a few cafeterias have a separate hot water heater for the public restrooms. The public restrooms which are serviced by the heat recovery unit use approximately 1 percent of the hot water generated by the unit. Equipment such as the dishwasher uses 5-1/2 gallons of 180 degree water a minute for the 8 to 9 hours a day it is in use. The heat recovery unit is adaptable to any business that generates hot gases from air conditioning and refrigeration operations and also consumes large volumes of hot water in operating other equipment. Cooler, Freezer and Garbage Room Floors and the Garbage Room.
The cooler, freezer and garbage room floors are constructed with a concrete slab on top of layers of insulation and are more than twice the depth of the floors in the remaining kitchen area. The insulation is necessary to help maintain the cool temperatures and to prevent the kitchen floor from buckling and cracking which may result from the cold temperatures in the freezer causing a buildup of moisture and resulting in a settling of the soil and foundation. The floors are *499 built with the additional insulation when a cafeteria is constructed. The construction of the cooler, freezer and garbage room floors is as follows: a 4-inch concrete slab is covered with 4 inches of insulation, which is covered by a 3-1/2-inch concrete slab topped with a layer of quarry tile which is set on epoxy and grouted with epoxy. The floors are constructed so that they are only 5/8 inch above the height of the floors in the normal working area of the kitchen. The refrigerated garbage room is used to store garbage until it can be removed by municipal garbage collectors. Storage in this manner is generally required by local health codes. The garbage room is constructed of concrete blocks with insulation applied to the interior walls and ceiling surface. Insulated panels are then used to cover the walls. The garbage room is part of the building but is accessible only from outside the cafeteria. There is no inside entrance to the garbage room. The garbage room temperature is maintained between 50 to 55 degrees in order to reduce odors and control insects. Kitchen Sanitary Wall and Floor Tile.
The kitchen sanitary wall is a ceramic tile wall extending from approximately *500 6 inches above the floor completely to the ceiling. The kitchen floor tile in issue is a guarry tile floor covering the entire floor area and extending up the walls to meet the ceramic wall tile which is approximately 6 inches up from the floor. The quarry tile has a somewhat rougher surface than the ceramic tile to prevent employees from slipping or falling. The tile floors and walls are constructed during the initial construction phase of the cafeteria. The tile is installed by placing the individual pieces or mats of connected pieces on a wet mortar cement base and a grout mixture is placed in the openings between the tiles. The tile walls and floors are easily cleaned and repetitive cleaning does not harm the appearance of the tile. The tiles are also very wear resistant. Petitioners are required by local health codes to have the kitchen floors and walls covered with a smooth surface that can be cleaned easily. Petitioners use tile on the walls and floors of their cafeterias in order to facilitate cleaning and maintenance of the kitchen area. After the mortar and grout have dried, removal of the titles is difficult and expensive. Kitchen Air Makeup Unit.
The kitchen *501 air makeup unit is a ventilation system consisting of a roof-mounted fan or blower, ducktwork, and ceiling diffusion grids and it may or may not contain heaters. The purpose of the kitchen air makeup unit is to ventilate the air in the kitchen area of petitioners' cafeterias and to replace the air exhausted from the kitchen by the range exhaust hoods with fresh outside air via air ducts and ceiling outlets. Petitioners are required by local building codes to exhaust approximately 24,000 cubic feet of air per minute from the kitchen due to the extensive cooking in that area. The range exhaust hoods expel large quantities of air containing smoke and odors from the kitchen and the kitchen air makeup unit replaces the exhausted air. Without the air makeup unit, a vacuum would be created in the kitchen area due to the great amount of air that must be exhausted. During the years in issue, prior to installation of air conditioners in petitioners' kitchens, temperatures in the kitchen during the summer could exceed 120 degrees without the air makeup unit bringing fresh air into the kitchen. During the years in issue, the kitchen area was not air conditioned and air supplied by the kitchen *502 air makeup unit was not air conditioned. However, in certain regions the air may be heated when the outside temperature requires heating. Petitioners installed heaters in the kitchen air makeup units for all cafeterias located north of Ocala, Florida. There were no heaters in the kitchen air makeup units for cafeterias located south of Ocala, Florida. The kitchen air makeup units are not used for air conditioning and heating of the customer dining area. That area is served by a different air conditioning/heating system. The kitchen air makeup units supply 90 percent of the replacement air for air exhausted from the kitchen. The remaining 10 percent of air is replaced from the dining room of the cafeterias to prevent kitchen odors from entering the dining room. The air makeup unit is located either on the roofs of the cafeterias or between the finished ceilings and the roofs. The ductwork is located between the ceilings and the roofs. The only part of the system visible from the kitchen area is the grating located in the kitchen ceilings. Kitchen Draingage.
The kitchen drainage in issue represents several components used in a system that drains water and liquid waste *503 from the kitchen sinks and floors through piping to a grease trap pretreatment unit and then onto the connection with the local sanitary system. Included in the kitchen drainage system are floor drain covers, open air drains, recessed openings in the slab floor, P traps, Y connections, T connections, piping and pipe connections, and grease traps. The components are constructed together to form a drainage system during the construction phase of a new cafeteria. Only the floor drain covers and the recessed openings are visible once the cafeteria is placed in service. The remainder of the system is concealed in the slab floors, behind finished walls or is buried in the ground outside the cafeterias. There are two types of drains used in petitioners' cafeterias. The first type is the hub, or open air drain. This drain allows an air gap to the drainage system and the equipment being drained. This type of drain is required by local health codes for equipment in which food is prepared. The open air drain prevents waste from being flushed back into the equipment through the drainage system. The second type of drain is the floor drain, which consists of grates in the floor connected *504 to the drainage system. The floor drains are used to drain wash water from the floor after the area has been cleaned. The floor drains can also be located immediately beneath a piece of equipment and serve the same purpose as a hub drain. In the hub drain, a pipe from the equipment being drained leads to a larger opening, or hub, into which the waste drains. There is an air gap between the receiving hub and the discharging pipe from the equipment. There is no special connector used in this drain. The grease trap pretreatment units which collect the waste from the kitchen drains are located outside of the cafeterias. A grease trap is an enclosed chamber installed in the ground near the cafeteria. It is designed to receive waste water from the kitchen drainage system and pretreat the influent by removing grease and food particles prior to discharging the waste water into the municipality's sanitary sewer system. The grease trap must be of sufficient size to permit an adequate detention period to allow suspended grease to float to the top of the tank and food particles to settle to the bottom. If petitioners closed or sold a cafeteria, the drainage system would be left in the *505 floor rather than moved to a new location. It would not be feasible to tear up the floors in order to get to the drains. If petitioners replace a piece of equipment for which the existing drain is not suitable, that drain would be blocked off and new drainage would be installed. Electric Water Coolers.
The electric water coolers, located in the kitchen area of the cafeterias, provide cool drinking water solely to petitioners' employees during the day. The water coolers are not used by petitioners' cafeteria customers. The water coolers are connected to the fresh water supply system and kitchen drainage system by the use of standard plumbing connections. Water coolers, which are electrical-powered refrigeration units, chill the water prior to its use. Water coolers can be either wall-mounted or freestanding. In either case, the plumbing connections will be direct connections with the building's plumbing system. The wallmounted water coolers are attached to and are supported by the wall framing by means of reinforced bracing or wall brackets concealed behind the finished wall surface. The electric water coolers are provided to petitioners' employees in order to allow *506 them to drink cool water without using water glasses which may break. In some geographic areas, petitioners are required by local health codes to provide electric water coolers for their employees. When petitioners move a cafeteria, the water coolers are moved to the new location. Chandeliers, Decor Wall Lights, Dimmers and Installation.
Chandeliers are ceiling-hung light fixtures with a frame providing multiple lighting elements. A chandelier will generally be attached to a support bracket mounted to a structural portion of the ceiling. A single chain may be used to suspend the chandelier above the dining area. The chandelier will generally use bulbs with wattage ratings ranging from 15 watts to 25 watts, but the bulbs may range up to 40 watts. The chandelier wiring consists of direct wire connections to conjunction boxes installed in the ceilings. The wiring is then connected to the building's electrical system. When one of petitioners' cafeterias is remodeled every 5 years, the chandeliers are often changed or can be replaced by ceiling fans. Decor wall lights are wall-mounted lights, mounted by bolting the fixtures to the finished walls. The wiring connections *507 are concealed behind the base plates of the wall fixtures and behind the finished walls. Typically, the wall lights will be designed and coordinated to match the design of the chandleiers. The chandeliers and decor wall lights in issue provide from 5 percent to 40 percent of the available lighting in both the dining and kitchen areas of petitioners' cafeterias. The chandelier lights and wall lights are controlled by circuit breakers in the lighting panel box. Dimmer switches are installed on the circuit wiring to the chandeliers and wall lights. The dimmer switches are variable rheostats that permit the cafeteria manager to vary the lighting intensity within the dining area as desired. The switches are mounted to the walls by screws and are placed directly over the outlet boxes for direct connection to the building's electrical system. Kitchen Hot Water Heater.
The hot water heater in issue is a 300 or 400 gallon capacity tank with nickel, steel or glass lining that is insulated and receives either cold water or water that has been warmed and produces 140 or higher degree water. The hot water heater provides hot water for the kitchen appliances and equipment and in most *508 cafeterias for both the employee and customer restrooms. However, less than 1 percent of the hot water used in petitioners' cafeterias is used in the public restrooms. The size of the hot water heater is based upon the amount of water that is being used in the sinks, the kitchen equipment and the dishwasher, per hour. The connection from the hot water heaters in issue to the various appaliances and restrooms is through pipes located in the walls, ceiling or floor. A subsequent user of the building such as a retail establishment that did not use substantial amounts of hot water would have no use for the oversized water heaters in issue. Primary Electrical Distribution System.
In petitioners' cafeterias, the portion of the electrical distribution system that brings in electricity from the outside source and feeds the electricity to the primary distribution point is referred to as the primary electric system. The primary electric system includes the wires and conduits from the outside power source, any transformer needed at this stage and the main distribution panel including the primary power switchgear. [5]
*509 The secondary electric system in petitioners' restaurants distributes electricity from the main distribution panel to the kitchen equipment panels and the lighting panels. It includes the wiring and conduit (lighting panel feeder wires and kitchen panel feeder wires) from the main distribution panel to the subsidiary panels, and the subsidiary panels themselves, including the kitchen panel boards and the lighting panel boards. The consumptive devices in petitioners' restaurants are the ultimate users of electrical power. They include the wiring and conduit leading to those devices. The consumptive devices include lighting fixtures for the restaurant; kitchen equipment branch wiring (for which investment tax credit has already been allowed); kitchen appliance wiring (investment tax credit allowed); building service branch wiring for heating, ventilation and air conditioning equipment, receptacles, restrooms, cash registers, etc.; emergency lighting; yard lighting; and miscellaneous other electrical wiring and components. The breakdown of costs attributable to the various components of the electrical distribution system are as follows: Electrical Distribution System Cost *510 Name
FY 1977
FY 1978
Total
Primary Electric
Incoming Power Wiring
$ 16,331
$32,876
$49,207
Primary Power Switchgear
73,310
147,577
220,887
Secondary Electric
Lighting Panel Feeder Wires
9,259
18,639
27,898
Kitchen Panel Feeder Wires
10,923
21,989
32,912
Lighting Panel Boards
22,142
44,574
66,716
Kitchen Panel Boards *
K/K1/K2/K3
23,722
86,008
109,730
Consumptive Devices
Building Service Branch
Wiring (Includes Conduit
Cost 75% of Total)
84,675
170,455
255,130
Kitchen Equipment Branch
Wiring *
80,042
91,331
171,373
Lighting Fixtures
154,425
310,867
465,292
Miscellaneous Installations *
(1) Emergency Lighting
36,351
57,099
93,450
(2) Chandelier Installation
and Wall Decor Lights
5,397
4,026
9,423
(3) Miscellaneous Other
Electrical Installation
98,846
148,060
246,906
Yard Lighting
57,798
116,350
174,148
Total Electrical
Distribution System Costs
$673,221
$1,249,851
$1,923,072
A study was conducted by Pennsylvania State University *511 to measure the electrical consumption of seven typical food service operations including petitioners' Williamsburg, Virginia cafeteria. The study metered five basic areas of electrical consumption common to each of petitioners' cafeterias: 1. Food preparation 2. Sanitation 3. Refrigeration 4. Lighting 5. Heating, ventilation and air conditioning The percentages of all kilowatt hours of the electricity used by petitioners in their Williamsburg cafeterias attributable to the electrical consumption necessary to power machinary and equipment was 69.2 percent for the period studied. The "load" on an electrical circuit is expressed in terms of voltage or kilovolt-amperes (kVA). A kilovoltampere is the voltage (in thousands) multiplied by the amperes of the circuit. The load of an electrical circuit is commonly considered to be the amount of electricity flowing through the circuit and is synonymous with power, or power demand. The loads on the electrical circuits in petitioners' cafeterias at issue and the division of the loads between circuits used to power machinery and equipment and circuits used to power the operation and maintenance function of the restaurant building *512 measured as the percentage of the kilovolt-amperes load going into each of petitioners' restaurants is as follows: [6]
Percentage of Load Applicable to Operation of Machinery and Equipment
With Kitchen Air
With Kitchen Air
Makeup Unit
Makeup Unit
Not Qualifying
or
Qualifying
Restaurant
For Credit
For Credit
FISCAL YEAR 1977
Titusville, FL
62.5
64.4
Altamonte Springs, FL
53.6
55.1
Pinellas Square, FL
53.6
55.1
Lexington Mall, KY
41.6
42.9
Raceland Mall, KY
53.9
55.5
Tampa Bay Center, FL
53.6
55.1
Eastlake Square, Tampa, FL
48.5
49.9
Winterhaven, FL
53.6
55.1
Panama City, FL
55.8
57.4
Biloxi, MS
53.6
55.1
Albany, GA
41.4
42.7
FISCAL YEAR 1978
Eastdale Mall, AL
65.8
67.7
Carbondale, IL
53.7
55.3
Whitehaven, TN
51.1
52.6
Coral Springs, FL
48.5
49.9
Sarasota, FL
59.0
60.8
Florence, KY
50.1
51.6
Naples, FL
53.0
54.5
Oaks Mall, FL
53.9
55.5
Vero Beach, FL
63.4
65.2
Owensboro, KY
51.7
53.3
Regency Square, FL
56.3
58.0
Winter Park, FL
64.7
66.6
Tupelo, MS
48.5
49.9
Metro Center, Jackson, MS
61.0
62.9
Hammond, LA
65.2
67.1
Columbia Mall, SC
56.6
58.3
Woodhill Center, SC
51.5
53.0
Williamsburg, VA
49.2
50.7
*513 The electrical distribution system consists of standard electrical equipment that is purchased off the shelf from electrical equipment suppliers and is used in a wide variety of buildings. The electrical distribution system can be used and adapted to supply electricity to almost any type of electrical appliance or equipment. Since the electrical distribution system consists of components manufactured for general electrical use, a subsequent tenant in a similar food service business might be able to adapt the electrical distribution system in petitioners' cafeterias for his own use. The electrical system leading to petitioners' cafeterias was more than adequate for the normal and customary stores or businesses that would be possible tenants for space in a building, shopping center or mall. Petitioners' cafeterias typically have 30 and 40 watts a square foot in electrical capacity whereas office space or shopping centers use only 15 watts a square foot. During the years at issue in this case, petitioners constructed several cafeterias *514 and equipped them with items for which they claimed investment tax credits on their tax returns. In the notices of deficiency issued to petitioners for tax years ending May 28, 1977, and June 3, 1978, respondent disallowed petitioners' claim of investment tax credit on numerous items including the 19 items which remain in issue in this case with the explanation that the investment credit was claimed on property not constituting qualified section 38 property as defined in section 48 of the Code. In the notices of deficiency issued to Morrison Cafeteria of Jefferson Parish, Inc., and Morrison Food Services of Virginia, Inc., for tax year ending May 31, 1975, respondent disallowed petitioners' claim for carryback of investment credits from tax year ending May 31, 1978, to tax year ending May 31, 1975, with the explanation that all investment credit earned for tax year ending May 31, 1978, was allowed in that year. Petitioners in their petition also claimed investment tax credit on a portion of their primary electrical distribution system. No investment tax credit was claimed on the return for this item, but later petitioners filed claims for refund based on this item. OPINION *515 Section 38 allows a credit against tax for investments in certain types of property, described as "section 38 property." In relevant part, section 48(a) states: (a) Section 38 Property.-- (1) In general.--Except as provided in this subsection, the term "section 38 property" means-- (A) tangible personal property (other than an air conditioning or heating unit), or (B) other tangible property (not including a building and its structural components) but only if such property-- (i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, * * * Tangible personal property is defined in section 1.48-1(c), Income Tax Regs., as follows: For purposes of this section, the term "tangible personal property" means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which *516 are structural components of such buildings or structures). * * * Tangible personal property includes all property (other than structural components) which is contained in or attached to a building. * * * A "structural component" of a building is ineligible for an investment tax credit and that term is defined in section 1.48-1(e)(2), Income Tax Regs., as follows: (2) The term "structural components" includes such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefor such as panelling or tiling; windows and doors; all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts; plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and lighting fixtures; chimneys; stairs, escalators, and elevators, including all components thereof; sprinkler systems; fire excapes; and other components relating *517 to the operation or maintenance of a building. However, the term "structural components" does not include machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs. Machinery may meet the "sole justification" test provided by the preceding sentence even though it incidentally provides for the comfort of employees, or serves, to an insubstantial degree, areas where such temperature or humidity requirements are not essential. For example, an air conditioning and humidification system installed in a textile plant in order to maintain the temperature or humidity within a narrow optimum range which is critical in processing particular types of yarn or cloth is not included within the term "structural components". * * * [emphasis added.] This Court has held that section 1.48-1(e)(2), Income Tax Regs., represents an accurate interpretation of Congressional intent and *518 has the full force and effect of law. Piggly Wiggly Southern, Inc. v. Commissioner,84 T.C. 739, 750 (1985), on appeal (11th Cir., Dec. 23, 1985); Fort Walton Square, Inc. v. Commissioner,54 T.C. 653, 661 (1970). Petitioners take the primary position that all the items in issue are tangible personal property within the meaning of section 1.48-1(c) of the Income Tax Regulations. Petitioners also contend that in any event all the items are "other tangible property" because they are used as an integral part of manufacturing or the production of food products. Respondent contends that the various items in issue are not "tangible personal property" as defined in the regulations and that since petitioners were not engaged in manufacturing or production of food products but rather in the retail sale of such products, the provisions with respect to "other tangible property" are not applicable to them. We will first address petitioners' contentions that they are in the business of manufacturing or production within the meaning of section 48(a)(1)(B), since this determination will affect the standard by which petitioners' *519 claims to investment tax credit are judged. In our view, petitioners' activity of operating cafeterias was a retail activity rather than a "manufacturing" or "production" activity within the meaning of section 48(a)(1)(B)(i). Section 1.48-1(d)(2), Income Tax Regs., provides that-- "manufacturing", "production", and "extraction" include the construction, reconstruction, or making of property out of scrap, salvage, or junk material, as well as from new or raw material, by processing, manipulating, refining, or changing the form of an article, or by combining or assembling two or more articles, * * *. Thus, section 38 property would include * * * the processing of meat, fish, or other foodstuffs; * * * As used in section 48(a)(1), the terms "manufacturing" and "production" are to be given their commonly accepted meaning. H. Rept. 1447, 87th Cong., 2d Sess., A18 (1962), 1962-3 C.B. 503, 516; S. Rept. 1881, 87th Cong., 2d Sess. 155 (1962), 1962-3 C.B. 843, 859. Petitioners operated retail cafeterias and the preparation of food incidental *520 to the retail sale of such food to the general public for consumption is not considered a manufacturing or producing activity. In Piggly Wiggly Southern, Inc. v. Commissioner,84 T.C. 739, 749 (1985), on appeal (11th Cir., Dec. 23, 1985), we stated with respect to the taxpayer's claim that its preparation of meat for retail sale placed it in the business of manufacturing or production within the meaning of section 48(a)(1), as follows: Activities involving the sale of merchandise and food to the general public for personal or household consumption and the rendering of services incidental to the sale of such goods are considered retail activities rather than manufacturing or producing activities. See Rev. Rul. 81-66, 1981-1 C.B. 19, 20. The meat prepared in petitioner's stores was for direct sale to and consumption by the general public. Thus, the preparation of meat was incidental to petitioner's retailing activities, and was not among the activities encompassed by section 48(a)(1)(B)(i). There is no distinction in petitioners' food preparation in the *521 instant case and the taxpayer's meat preparation in the Piggly Wiggly Southern, Inc. case. Here, as in that case, petitioners' activities were not among those encompassed by section 48(a)(1)(B)(i). Therefore, in this case our determination of whether petitioners are entitled to the claimed investment tax credits depends on whether the items are "tangible personal property" within the meaning of section 48(a)(1)(A). As we pointed out in Whiteco Industries, Inc. v. Commissioner,65 T.C. 664 (1975), tangible personal property is not to be narrowly defined or to necessarily follow the rules of State law. H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 415. Generally, all tangible property is tangible personal property unless it is excluded as land or an improvement thereto. In Whiteco Industries, Inc. v. Commissioner,supra at 672-673, we listed the following criteria for determining whether property is tangible personal property within the meaning of section 48(a)(1)(A): (1) Is the property capable of being moved, *522 and has it in fact been moved? * * * (2) Is the property designed or constructed to remain permanently in place? * * * (3) Are there circumstances which tend to show the expected or intended length of affixation, i.e., are there circumstances which show that the property may or will have to be moved? * * * (4) How substantial a job is removal of the property and how time-consuming is it? Is it "readily removable"? * * * (5) How much damage will the property sustain upon its removal? * * * (6) What is the manner of affixation of the property to the land? * * * See Scott Paper Co. v. Commissioner,74 T.C. 137, 170-172 (1980), which also discusses these questions in determining whether an item is tangible personal property for the purpose of the investment tax credit. Under the criteria set forth above and bearing in mind that the term "tangible personal property" is not to be narrowly defined for purposes of section 48(a)(1)(A), whether the various items claimed by petitioners are tangible personal property is in each instance a factual determination. Emergency Lighting.
Petitioners state that the primary purpose for the installation *523 of the emergency lighting is to provide ample lighting for customers to finish their meals in the event of a power failure and to provide assurances that petitioners will be able to collect the amount owed by their customers. In petitioners' cafeterias, customers pay for their meals only after they have finished eating. Petitioners argue that the emergency lighting in issue is far in excess of that necessary for safety reasons in case of a power failure and serves only an incidental function of providing light for such safety requirements. Petitioners consider the emergency lighting as tangible personal property within the meaning of section 48(a) because it can be readily moved without any material damage to the premises. Respondent argues that "lighting fixtures" are specifically mentioned as structural components in section 1.48-1(e)(2), Income Tax Regs. In addition, respondent argues that the emergency lighting relates to the operation, or maintenance of the building and thus constitutes a structural component of the building. In our view, petitioners' emergency lighting qualifies for the investment tax credit as tangible personal property because *524 it meets many of the criteria for such property outlined in the Whiteco Industries case, supra. In the Senate Report accompanying the Revenue Act of 1962, S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 722, tangible personal property qualifying for the credit is stated to include "assets accessory to a business." The emergency lighting fixtures are distinguishable from lighting fixtures specifically mentioned in section 1.48-1(e)(2), Income Tax Regs., as constituting structural components of a building because these emergency fixtures do not provide basic illumination in the cafeterias. It is clear that lighting fixtures providing basic illumination in the cafeterias constitute structural components. However, the emergency lighting equipment serves a special function in petitioners' cafeterias where large numbers of people are served and must not only exit but finish eating and pay for their meals in the event of a power blackout. The emergency lighting enables petitioners to accomplish these objectives. The Senate Finance Committee Report for the 1978 Revenue Act (Pub. L. 95-600), S. Rept. 95-1263 (1978), 1978-3 C.B. (Vol. 1) 321, 415, *525 provides as follows: In addition, the committee wishes to clarify present law by stating that tangible personal property already eligible for the investment tax credit includes special lighting (including lighting to illuminate the exterior of a building or store, but not lighting to illuminate parking areas) * * * [Emphasis added.] In our view the emergency lighting qualifies as "special lighting." Consequently, emergency lighting is not a structural component of the building but instead is tangible personal property and as such qualifies for the investment credit. Kitchen Panel Boards.
Petitioners contend that since the kitchen panel boards are necessary to and are used directly with specific items of machinery or equipment they are not structural components but constitute tangible personal property within the meaning of section 1.48-1(c), Income Tax Regs. Petitioners argue that the kitchen panel boards only serve petitioners' cafeteria kitchen equipment and machinery. Respondent contends that the kitchen panel boards are part of the electrical wiring system of petitioners' cafeterias and are therefore specifically designated as structural *526 components by section 1.48-1(e)(2), Income Tax Regs. Respondent argues that the panel boards are of standard electrical design rather than being specifically designed for use in petitioners' cafeterias. Respondent argues further that another tenant occupying the cafeteria could use the identical panel boards which have room for many circuits which can be changed simply by replacing the circuit breaker or installing a different electrical line to another appliance. In our view the kitchen panel boards, which are merely holding devices for the circuit breakers that connect the electrical supply wires leading to the kitchen appliances, are necessary to and are used directly with specific items of kitchen machinery or equipment in petitioners' cafeterias. The kitchen panel boards in issue are thus distinguishable from the general equipment panel boards used to provide electricity to the remainder of the cafeteria. Central Citrus Co. v. Commissioner,58 T.C. 365, 374 (1972); H. Rept. No. 1447, 87th Cong., 2d. Sess. (1962), 1962-3 C.B. 503, 516. Although the kitchen panel boards may be adaptable to other equipment, petitioners used *527 the kitchen panel boards solely to accommodate the heavy duty equipment used in the kitchen. Therefore they are not structural components of the building but are essentially accessory to petitioners' business. S. Rept. 1881, 87th Cong., 2d. Sess. (1962), 1962-3 C.B. 707, 722. [7]
We conclude that the kitchen panel boards are eligible for the investment tax credit as tangible personal property because they constitute assets accessory to petitioners' business. Kitchen Hand Sinks.
The kitchen hand sinks are necessary solely and exclusively because petitioners are engaged in food processing. Petitioners emphasize that the sinks are required by local codes to be located in the kitchen work areas in order to promote cleanliness by encouraging employees to wash their hands and are readily removable without any material damage to the premises. For these reasons, petitioners contend that the sinks constitute tangible personal property within the meaning of section 48(a)(1). Respondent contends that the kitchen hand sinks are plumbing *528 fixtures that relate to the operation or maintenance of the building within the meaning of section 1.48-1(e)(2), Income Tax Regs. Respondent emphasizes that the sinks may be adapted to other uses by petitioners. The sinks, respondent argues, are not unique to cafeterias but are commonly used in many businesses such as doctors' or dentists' offices. In addition, respondent argues that the sinks are designed to remain permanently in place as long as petitioners operate the cafeterias and therefore the sinks are structural components of the cafeterias. The kitchen hand sinks do not function as specialized items of machinery or equipment even though the sinks are generally removed when a cafeteria is closed. They are bolted to the wall and connected to the plumbing system in a way to make removal difficult. These sinks are a part of the plumbing system. An application of the Whiteco Industries factors to this item indicates that the kitchen hand sinks, although solely serving the needs of petitioners' kitchen employees, were inherently permanent structures because they could be moved only with great difficulty, were designed to remain permanently in *529 place, and were permanently attached to the plumbing in the cafeterias. We thus conclude that the kitchen hand sinks constitute structural components and do not qualify for the investment tax credit. Kitchen Water Piping.
Petitioners claim that the kitchen water piping constitutes "other tangible property" because it is essential for the operation of specific pieces of petitioners' kitchen machinery and equipment and the preparation of foodstuffs. Petitioners emphasize that the removal of the kitchen water piping would not affect the cafeteria's main water piping and sanitary drainage and thus does not relate to the operation or maintenance of the building. In petitioners' view, the kitchen water piping is used as an integral part of petitioners' processing activities and is essential to the completeness of those activities. Respondent contends that the kitchen water piping is part of the building's plumbing system and is thus a structural component within the meaning of section 1.48-1(e)(2), Income Tax Regs. Respondent emphasizes that the kitchen water piping is installed permanently below the cafeteria's concrete and tile floor and would be abandoned *530 if petitioners closed a particular cafeteria. Respondent also emphasizes that the kitchen water piping could be adapted to general use and therefore could be used by a future tenant not operating a restaurant or cafeteria if petitioners vacated the building. Respondent also adds that petitioners could replace a piece of equipment and use the same water line to service the new equipment. In Scott Paper Co. v. Commissioner,74 T.C. 137, 183 (1980), we stated that items occurring in unusual circumstances that do not relate to the operation or maintenance of the building should not be considered as structural components even though specifically listed as such in section 1.48-1(e)(2) of the Income Tax Regulations. We there held the critical test to be whether the improvements related to the overall operation or maintenance of the building. It is clear that the cafeterias' kitchen water piping does not relate to general building plumbing which involves the operation or maintenance of petitioners' cafeterias. Instead, all the kitchen water piping in *531 issue directly services petitioners' kitchen equipment and machinery. [8] We conclude that the kitchen water piping is necessary to and is used directly with specific pieces of petitioners' equipment and thus qualifies as section 38 property for investment tax credit purposes. Scott Paper Co. v. Commissioner,supra;section 1.48-1(e)(2), Income Tax Regs.
*532 Eliason Doors.
According to petitioners, the Eliason doors which are special lightweight, double action doors installed to prevent accidents in the heavily trafficked area between the serving lines and the kitchen, do not serve a function merely as a front or rear door but are specially designed with a window to enable employees to move between the kitchen and the serving line without using their hands. Petitioners argue that the Eliason doors serve their specialized needs and are thus tangible personal property within the meaning of section 48(a)(1) because they are readily removable without any material damage to the premises. Respondent argues that "doors" are specifically mentioned as "structural components" of a building in section 1.48-1(e)(2), Income Tax Regs. To support his position, respondent cites Consolidated Freightways, Inc. v. Commissioner,708 F.2d 1385 (9th Cir. 1983), affg. in part and revg. in part, 74 T.C. 768 (1980), as well as Consolidated Freightways, Inc. v. United States,620 F.2d 862 (Ct. Cl. 1980). Consolidated Freightways dealt with whether or not overhead doors in *533 loading docks constituted structural components. This Court held that the overhead doors qualified for the tax credit but the Court of Appeals for the Ninth Circuit in construing the language in section 1.48-1(e)(2), Income Tax Regs., which includes "windows and doors" within the meaning of "structural components," held that the overhead doors did not qualify for the credit. The Ninth Circuit focused on a variety of factors including the function and design of the door, the intent of the taxpayer in installing the door, and the effect on the underlying building of the door's removal. The Ninth Circuit concluded that the overhead doors functioned as an integral part of the loading docks, were designed to be used as permanent features of the docks and that removal of the overhead doors would detract significantly from the usefulness of the docks in the taxpayer's operation. 708 F.2d at 1390. Thus, the Circuit Court concluded that the overhead doors constituted structural components and did not qualify for the investment tax credit. The Eliason doors constitute a structural component only if they are a permanent part of the cafeteria building, *534 so that their removal would affect the essential structure of the building. Sec. 1.48-1(e), Income Tax Regs. In the Senate report underlying the 1962 legislation, it is stated: Tangible personal property is not intended to be defined narrowly here, nor to necessarily follow the rules of State law. It is intended that assets accessory to a business such as grocery store counters, printing presses, individual air-conditioning units, etc., even though fixtures under local law, are to qualify for the credit. Similarly, assets of a mechanical nature, even though located outside a building, such as gasoline pumps, are to qualify for the credit. * * * [S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 722.] In our view the Eliason doors did not function as an integral part of the cafeterias and were not designed to be used as a permanent feature of the cafeterias. Removal of the doors would not detract significantly from the usefulness of the cafeterias because they have no more than an incidental relationship to the operation or maintenance of the building. The doors were necessary to assist petitioners in the operation of their *535 cafeterias by providing their employees with easy and safe passage in and out of the kitchen area of the cafeterias. The record reflects that the doors were temporary attachments that could be removed easily and quickly. We conclude that the Eliason doors are not structural components of the cafeterias and thus qualify for the investment tax credit. Restroom Accessories.
Petitioners contend that the restroom accessories constitute tangible personal property within the meaning of section 48(a)(1) because they are readily removable without any material damage to the premises. Petitioners argue further that a subsequent tenant would have no use for the items included in this claim because it is unlikely a subsequent tenant would be required to have the number of restroom facilities that are required in petitioners' business. Respondent contends that the restroom accessories in issue are similar to those found in any public restroom and that these items relate to the operation or maintenance of the building rather than to petitioners' operation of a cafeteria. Respondent argues that all buildings open to the public must have restrooms and these restrooms usually include accessories *536 like those in issue. These accessories, according to respondent, were not involved in an activity specifically related to the operation of a cafeteria. Respondent cites a District Court opinion from the Eastern District of North Carolina, A.C. Monk & Co. v. United States, No. 78-126-CIV-4 (E.D.N.C., March 30, 1981, affd. in part, revd. in part and remanded in part on another issue, 686 F.2d 1058 (4th Cir. 1982), on remand 52 AFTR 2d 83-6327, 83-2 USTC par. 9678) (E.D.N.C., Nov. 1, 1983). The taxpayer in Monk processed tobacco and claimed an investment tax credit for wall mirrors, towel dispensers and receptacles and similar items located in the factory and office lavatories. The court disallowed the taxpayer's claim and concluded that these items were intended to be permanent building fixtures. In our view, the restroom facilities do not qualify for the credit because they are not an integral part of petitioners' business of operating a cafeteria. The accessories serve no function particularly unique to a cafeteria. The restroom accessories relate to the overall operation or maintenance of the building and as such are structural components. *537 Scott Paper Co. v. Commissioner,supra at 186. Most buildings or facilities serving the public must have public restrooms and accompanying accessories similar to those at issue in this case. We conclude that the restroom accessories do not qualify for the credit. Decor Window Treatment.
Petitioners take the view that the decor window treatment serves purely a decorative function and is changed every 5 years in conjunction with other changes in petitioners' decorative plan. The window treatment, according to petitioners, does not serve a function relating to the operation or maintenance of the building because the simulated windows are impossible to see through and function merely as ornamentation. Removal of the decor wall treatment would not detract from the cafeterias's function, according to petitioners, and thus the decor window treatment constitutes tangible personal property. Respondent argues that the decor window treatment was used as part of the permanent wall coverings and therefore is strictly defined as structural components in section 1.48-1(e)(2), Income Tax Regs.
We conclude that the decor wall treatment *538 qualifies for the investment tax credit because it serves no more than an incidental relationship to the operation or maintenance of the building. The Senate stated in Report No. 95-1263: In addition, the committee wishes to clarify present law by stating that tangible personal property already eligible for the investment tax credit includes * * * false balconies and other exterior ornamentation that have no more than an incidental relationship to the operation or maintenance of a building, and identity symbols that identify or relate to a particular retail establishment or restaurant such as special materials attached to the exterior or interior of a building or store and signs (other than billboards). * * * [S. Rept. 95-1263 (1978) 1978-3 C.B. (Vol. 1) 321, 415. Emphasis added.] The decor window treatment served merely a decorative function in the cafeterias. It is changed approximately every 5 years in conjunction with the redecoration of the entire cafeteria. In our view, the window treatments do not contribute to the operation or maintenance of the building and thus constitute personal property eligible for the credit. Removal of the decor wall treatment *539 would not damage the underlying wall. Any marks or holes left in the wall would be minimal. Lattice Millwork.
Petitioners state that the lattice millwork is also a decorative item which is replaced every 5 years and does not relate to the operation or maintenance of the building. Petitioners contend that the lattice millwork constitutes readily removable tangible personal property. Respondent argues that the lattice millwork is part of the permanent covering of the walls and thus constitutes structural components within the meaning of section 1.48-1(e)(2), Income Tax Regs.
As stated in Senate Report No. 95-1263, the lattice millwork has "no more than an incidental relationship to the operation or maintenance of a building." "Removable partitions, * * * which are attached to walls or suspended from the ceiling, are considered tangible personal property and not structural components." S. Rept. 95-1263 (1978), 1978-3 C.B. (Vol. 1) 321, 415. We conclude that the lattice millwork qualifies as personal property eligible for the investment tax credit. The lattice millwork is merely decorative ornamentation serving no more than an incidental *540 relationship to the operation or maintenance of the building. Although the lattice millwork may be used to physically separate the serving line from the dining portions of the cafeteria, it does not serve as a structural support for the ceiling of the cafeteria. The lattice millwork could easily be removed without permanently damaging the underlying ceiling or walls and its removal would not entail great expense. The lattice millwork is tangible personal property qualifying for the investment tax credit. Vanity Cabinets and Counters.
Petitioners state that they are required by local occupancy codes to install more restroom facilities such as vanity cabinets and counters than would be required in a building of the same size used for general purposes due to their business of serving large numbers of people at one time. Petitioners conclude that the vanity cabinets and counters are thus accessory to their business of operating a cafeteria. Respondent contends that the counters and cabinets are attached permanently to the building because they are bolted to the wall. Respondent also argues that the vanity cabinets and counters could be used by any subsequent tenant occupying *541 the cafeteria premises and do not relate specifically to petitioners' particular business. Respondent concludes that the vanity cabinets and counters were a necessary part of petitioners' public restrooms and are thus necessary in the operation or maintenance of the building within the meaning of section 1.48-1(e)(2), Income Tax Regs.
In our view the vanity cabinets and counters constitute structural components of the buildings and do not serve a function unique to petitioners' business. They are not accessory to petitioners' business of operating a cafeteria. The regulations specifically provide that "plumbing and plumbing fixtures, such as sinks and bathtubs" constitute structural components ineligible for the credit. The record reflects that the counters and cabinets were permanently attached to the walls of the restrooms and that removing them would damage the underlying walls. Whiteco Industries, Inc. v. Commissioner,supra.
Customer Line Screen.
Petitioners state that the customer line screen is designed to direct customers to the serving line. Petitioners argue that the line screen is not used as a wall separating *542 rooms and supporting the ceiling but is a decorative partition required by petitioners' particular business needs. The line screen, according to petitioners, is integrally related to the line cafeteria concept and removal of the line screen would not in any way detract from the usefulness of the building but would impair petitioners' efficient control over the travel of customers in the cafeteria. Respondent takes the view that the customer line screen is a structural component due to the inclusion of "walls" and "partitions" in the definition of structural components in section 1.48-1(e)(2), Income Tax Regs. Respondent focuses on the alleged permanent nature of the screen in issue and attempts to distinguish the customer line screens in issue from the movable partitions in Minot Federal Savings and Loan Assn. v. United States,435 F.2d 1368 (8th Cir. 1970), and King Radio Corp., Inc. v. United States,486 F.2d 1091 (10th Cir. 1973). In those cases investment tax credit was granted for partitions which could easily be moved and relocated without causing noticeable damage to the structure. The courts concluded that the *543 movable partitions constituted tangible personal property rather than structural components of the taxpayers' buildings.[9] Petitioners' customer line screen is similar to the movable partitions discussed in Minot Federal Savings and Loan Assn. and in King Radio Corp.The terms "walls" and "partitions" as used to define "structural components" in section 1.48-1(e)(2), Income Tax Regs., mean inherently permanent walls and partitions. Minot Federal Savings & Loan Assn. v. United States,313 F. Supp. 294 (D. N.D. 1970), affd. 435 F.2d 1368 (8th Cir. 1970); King Radio Corp, Inc. v. United States,486 F.2d 1091 (10th Cir. 1973). *544 The Senate Finance Committee, in its Report No. 95-1263 (1978), 1978-3 C.B. (Vol. 1) 321, 415, issued in connection with the enactment of the Revenue Rule Act of 1978, Pub. L. 95-600, 92 Stat. 2767, stated as follows: In addition, the committee wishes to clarify present law by stating that tangible personal property already eligible for the investment tax credit includes * * * movable and removable partitions * * * The customer line screen at issue in the instant case was a decorative partition separating the dining room from the cafeteria serving line and, like the movable partitions involved in Minot Federal Savings & Loan Assn. and King Radio Corp., was capable of being stored, sold or reused in its entirety. We conclude that the customer line screens constitute personal property eligible for the investment tax credit. Serving Line Concrete Curb.
Petitioners state that the purpose of designing and installing the serving line concrete curb was to prevent water from seeping into the customer side of the serving line and as such it is essentially part of the serving line equipment. Petitioners argue that the concrete curb aids essentially in cleaning *545 which is not a function relating to the operation or maintenance of the building. Respondent contends that the serving line concrete curb is permanently attached to the building and is constructed of brick or concrete blocks that are cemented or mortared to the floor and are covered with quarry tile. Moving the curb would be impractical according to respondent. Respondent notes that if petitioners closed a cafeteria, they left the serving line concrete curb and constructed another one at the new site. [10]
Applying the Whiteco Industries tests, we conclude that it would be impractical and expensive to move the curb due to its permanent nature. The *546 concrete curb is a structural component of the building and not tangible personal property. We hold that the concrete curb is not eligible for the investment tax credit. Kitchen Heat Recovery Unit.
Petitioners argue that the kitchen heat recovery unit is section 38 property because it constitutes "machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature * * * requirements which are essential for the operation of other machinery or the processing of * * * foodstuffs." Section 1.48-1(e)(2), Income Tax Regs. Petitioners contend that the kitchen heat recovery unit was installed solely because of the extensive hot water needs in their kitchens. Petitioners point out that any hot water supplied by the kitchen heat recovery unit to the remainder of the building is minimal. Respondent contends that the heat recovery system is part of the building's plumbing system and is thus considered a structural component under section 1.48-1(e)(2), Income Tax Regs. Respondent also emphasizes that the method of installation of the heat recovery unit, with pipes running in *547 the walls, floors, and ceiling of the cafeterias, renders it difficult to move. Respondent concludes that it is a permanent part of the plumbing system assisting in the operation or maintenance of the building. Without consideration of the "sole justification" test, the heat recovery system, consisting of circulation pipes and tubing, might be considered to constitute part of the plumbing system of petitioners' cafeterias and thus constitute a structural component. However, in Piggly Wiggly Southern, Inc. v. Commissioner,84 T.C. 739, 753 (1985), on appeal (11th Cir., Dec. 23, 1985), we held that items that might otherwise constitute structural components of a building are tangible personal property within the meaning of section 48(a)(1)(A) of the sole justification for their installation is to assist in the operation of the taxpayer's equipment. We conclude that petitioners' sole justification for the installation of the kitchen heat recovery system was that the system was essential to meet the hot water needs of petitioners' cafeterias in a cost effective manner. *548 Thus, we find that pursuant to section 1.48-1(e)(2), Income Tax Regs., petitioners' heat recovery unit meets the exception to the term "structural components." Section 1.48-1(e)(2), Income Tax Regs., defines structural component to include all components of a heating system including motors, compressors, pipes, ducts, plumbing and plumbing fixtures unless the "sole justification" test is met. When systems meet the sole justification test and are thus not structural components, they are considered property in the nature of machinery without regard to their inherent permanence. Piggly Wiggly Southern, Inc. v. Commissioner,supra at 753. Cooler, Freezer and Garbage Room Floors and the Garbage Room.
Petitioners contend that the cooler, freezer and garbage room floors which have more insulation than floors in the remaining portions of the cafeteria, were designed and installed to function as items of machinery and thus constitute tangible personal property. Respondent states that the cooler, freezer and garbage *549 room floors were the same as the floors in the remaining portions of the kitchen area, except that they were elevated approximately 5/8 inch above the remaining floors and had 4 inches of insulation and 4 inches of concrete beneath them which did not exist under other floors in the cafeteria. [11] Respondent also argues that floors are specifically defined as being structural components in section 1.48-1(e)(2), Income Tax Regs. Respondent emphasizes that the floors in issue could not be moved to another location without great expense, difficulty and damage to the underlying structure and thus were permanent additions to the building. Structural components are defined in the regulations to *550 include "floors." Section 1.48-1(e)(2), Income Tax Regs. To support their conclusion that the "sole justification" language applies to exclude their floors from the definition of structural components, petitioners have failed to note that the "sole justification" language applies only to "machinery" essential for the operation of other machinery or the processing of foodstuffs. Section 1.48-1(e)(2), Income Tax Regs. Floors do not constitute machinery and thus do not fit into this exception. Although the floors in issue may differ somewhat from the floors in the remaining portions of the cafeteria due to the fact that they are built on extra insulation, they nevertheless are floors. We consider them to be structural components due to the permanent nature in which they are installed. It would be difficult to remove them and removal would damage the underlying foundation. Senate Report No. 95-1263 states as follows with respect to floors: Similarly, floor coverings which are not an integral part of the floor itself such as floor tile generally installed in a manner to be readily removed (that is it is not cemented, mudded, or *551 otherwise permanently affixed to the building floor but, instead, has adhesives applied which are designed to ease its removal) * * * are considered tangible personal property and not structural components. * * * [S. Rept. 95-1263 (1978), 1978-3 C.B. (Vol. 1) 321, 415.] The cooler, freezer and garbage room floors here in issue could not be removed without substantial damage to the building and therefore constitute structural components of the cafeterias. We next consider whether the garbage room constitutes section 38 property. Petitioners maintain that the garbage room constitutes "other tangible property" used as an integral part of manufacturing or production under section 48(a)(1)(B)(i) and, therefore, qualifies as section 38 property. As previously discussed, section 48(a)(1)(B) is not applicable to petitioners since they were not engaged in manufacturing or production. Petitioners also argue that the garbage room, which is a refrigerated room consisting of concrete blocks and insulation panels applied to the interior wall and ceiling surfaces, in necessary to meet health code requirements by inhibiting the contamination of food waste in the garbage room *552 prior to pickup of the garbage. Petitioners argue that the refrigerated garbage rooms are not a building or a part thereof within the meaning of section 1.48-1(e)(1), Income Tax Regs. Petitioners argue that the refrigerated garbage rooms are integral to petitioners' food service activities. Petitioners cite Giannini Packing Corp. v. Commissioner,83 T.C. 526 (1984), appeal dismissed (9th Cir. June 10, 1985), to support their conclusion that the refrigerated garbage rooms are an integral part of petitioners' production activities and therefore constitute eligible section 38 property. In Giannini,supra, the taxpayer was engaged in the business of acquiring, processing, storing, and marketing fresh fruit and claimed an investment tax credit for the structural elements of two holding rooms in its packing plant. Concluding that cooling the fruit was one of the most important aspects of the taxpayer's fruit processing activities, we held that the holding rooms were an integral part of the taxpayer's production of fresh fruit and were "essential to the completeness of the activity" within the meaning of section 1.48-1(d)(4), Income Tax Regs. *553 , which defines when property is used as an "integral part" of "production." Section 1.48-1(d)(2), Income Tax Regs.Giannini Packing Corp. v. Commissioner,supra at 532. The Giannini Packing Corp. case deals with a taxpayer involved in processing fruits and is not applicable to petitioners. Respondent argues that the garbage room is part of the building itself and therefore not tangible personal property. Respondent emphasizes that the garbage room has walls, a floor, a ceiling, provides shelter, as well as a working space, and is thus part of the cafeteria building within the meaning of section 1.48-1(e)(1), Income Tax Regs.[12] In order to qualify as section 38 property, the garbage rooms must be shown to be tangible personal property under section 48(a)(1)(A). Due to the permanent nature of the garbage rooms and the inability of petitioners to physically move the room without great difficulty, expense and damage to the underlying building, we conclude it constitutes an inherently permanent structural component of the cafeteria within the meaning of section 1.48-1(e)(2), Income Tax Regs. *554 , and is ineligible for the investment tax credit. Kitchen Sanitary Wall and Floor Tiles.
Petitioners claim that the kitchen wall and floor tiles are eligible for the credit because their cafeterias are required by local codes to have readily cleanable surfaces in order to maintain sterile and sanitary conditions and inhibit bacterial *555 growth. Petitioners argue that the sanitary wall and floor tiles serve a business function particularly suited to their food processing operation and that the sanitary wall and floor tiles do not relate to the operation or maintenance of the building. Petitioners further argue that the removal of the floor and wall tiling would in no way alter the operation of a building because many buildings function with exposed concrete block, brick or painted surfaces. Respondent contends that "tiling" is specifically defined as a structural component in section 1.48-1(e)(2), Income Tax Regs.[13] Respondent argues that the tile used on the walls and floors is not unique to a cafeteria but is used in the public areas of many businesses. Respondent also notes that the wall and floor tile are permanently attached by mortar cement and a grout mixture which, after drying permanently, attaches the titles to the surfaces. *556 We agree with respondent that the kitchen wall and floor tiles constitute structural components of the cafeterias due to their permanent attachment by means of mortar or grout. In addition, the tiles are specifically mentioned as structural components in section 1.48-1(e)(2), Income Tax Regs., and Senate Report No. 95-1263 specifically states that floor tile, that is cemented, mudded, or permanently affixed to the building floor, constitutes a structural component ineligible for the investment tax credit. The only floor tile eligible for the credit according to the Senate Report is tile that has been applied by adhesives which are designed to ease its removal. S. Rept. 95-1263 (1978), 1978-3 C.B. (Vol. 1) 321, 415. Kitchen Air Makeup Unit.
Petitioners take the view that the kitchen air makeup unit aids them in satisfying ventilation requirements which are essential to the processing of foodstuffs in petitioners' cafeterias. Petitioners argue that the kitchen air makeup unit is analogous to the HVAC units in Piggly Wiggly Southern Inc. v. Commissioner,84 T.C. 739 (1985), on appeal (11th Cir., Dec. 23, 1985), in which *557 this Court held that the HVAC units qualified as section 38 property because their sole justification was meeting the temperature and humidity requirements essential to the operation of refrigeration equipment in the taxpayer's supermarkets. Petitioners emphasize that the purpose of the kitchen air makeup unit is not to provide the ventilation system for the kitchen but to replace air which must be exhausted and therefore the unit in issue does not function as an air conditioning system. Petitioners further contend that the kitchen air makeup unit is an integral part of their food processing operation and that a subsequent tenant would have no use for this system unless that tenant was engaged in the same business. Respondent contends that the kitchen air makeup unit substitutes for a ventilation system in petitioners' cafeterias and therefore is a structural component within the meaning of section 1.48-1(e)(2), Income Tax Regs. Respondent emphasizes that the kitchen air makeup unit brings in fresh air to the kitchen, is the only source of fresh air to the kitchen and therefore is a ventilation system relating to the operation or maintenance of the building. *558 Respondent also argues that petitioners intended the kitchen air makeup units to be permanently attached to the building and that they were designed to remain permanently in place during the life of the building. Respondent relies on Kramertown Co. v. Commissioner,488 F.2d 728 (5th Cir. 1974), affg. a Memorandum Opinion of this Court, in which the taxpayer's rooftop air conditioning and heating units were held ineligible for the credit because the taxpayer intended the equipment to remain in place permanently. For this reason, it was held that the equipment constituted a structural component. The purpose of the kitchen air makeup unit is to replace the 24,000 cubic feet per minute of air that is exhausted from the kitchen with filtered outside air via ducts in ceiling outlets. In our view the kitchen air makeup unit is analogous to the HVAC units that the taxpayer in Piggly Wiggly Southern installed in its supermarkets which we concluded were not structural components because "the sole justification for the installation of the HVAC units was the necessity to meet the temperature and humidity requirements of the refrigeration equipment in [the taxpayer's] *559 stores." 84 T.C. at 751. We stated therein that without consideration of the sole justification test, the HVAC units installed by the taxpayer would have constituted structural components as defined in section 1.48-1(e)(2), Income Tax Regs. 84 T.C. at 751. This Court distinguished the shopping centers' roof top air-conditioning and heating systems in Fort Walton Square, Inc. v. Commissioner,54 T.C. 653 (1970), and in Kramertown Co. v. Commissioner,supra.In both cases the rooftop air conditioners constituted structural components because the purpose of the systems in the shopping centers was customer convenience and the taxpayers failed to establish that the systems were essential to the operation of the taxpayer's machinery. In Piggly Wiggly Southern, however, the HVAC units were not structural components because they were essential to the operation of the refrigerator cases in the taxpayer's supermarkets. Here, as in the Piggly Wiggly Southern case, without consideration of the "sole justification" test the kitchen air makeup unit would constitute a structural component. However, *560 the evidence presented by petitioners clearly establishes that the sole justification for the installation of the kitchen air makeup unit was to maintain specific ventilation requirements esential for operation of petitioners' kitchen equipment. The unit qualifies as tangible personal property in the nature of machinery rather than a structural component [14] because it is installed only to meet temperature or humidity requirements that are essential for the operation of petitioners' other kitchen equipment. Section 1.48-1(e)(2), Income Tax Regs.
Respondent's contention that petitioners' air makeup unit substituted for a ventilation system in the cafeterias is not supported by the evidence. Kitchen Drainage.
Petitioners contend that the kitchen drainage constitutes tangible personal property because it was used as an integral part of their cafeteria operation and thus does not relate to the operation or maintenance of their cafeteria buildings. Respondent contends that the kitchen drainage system was a part of the building's plumbing system *561 within the ordinary meaning of that word and that "plumbing and plumbing fixtures" are specifically defined as structural components in section 1.48-1(e)(2), Income Tax Regs. Respondent emphasizes that there were two purposes for the drainage system: (1) to drain wash water that was used to wash and clean the cafeteria walls and floors; and (2) to drain waste water and other liquid waste produced in the food preparation process and lead these wastes to a grease trap in which grease and other food particles were separated from the water before it flowed into the sanitary sewer system. The drainage of the food preparation wastes was accomplished through the use of hub drains which were open air drains that did not allow waste to be siphoned back into the equipment and the kitchen wash water was drained through floor drains. Respondent also emphasizes that the installation of the kitchen drainage system was permanent because they system was either buried beneath the cafeteria slab floors, behind the finished walls, or was buried in the ground outside of the cafeteria. Respondent cites Everhart v. Commissioner,61 T.C. 328 (1973), to support *562 his argument. In Everhart, this Court held that a sewage disposal system constituted an inherently permanent structure even though it was a self-contained prefabricated unit. This Court based its decision on the system's permanent affixation to the land. 61 T.C. at 331. We find the sewage disposal system in Everhart to be distinguishable from the kitchen drainage at issue in the instant case. In Everhart, the taxpayer excavated an area for the sewage disposal tank and put in a concrete foundation. The tank was then lowered into the excavation and anchored to that foundation. After connecting the sewage pipes, the excavation was refilled and the area was enclosed by a chain link fence. The system in Everhart did not serve any specific needs of the taxpayer's laundromat business but related more to the operation or maintenance of the entire shopping center where the laundromat was located. We do not find respondent's analogy to this sewage system to be persuasive. [15]
*563 In our view petitioners' kitchen drainage system from the point the connecting devices couple to the drainage system is analogous to the electric wiring in Scott Paper Co. v. Commissioner,supra.We recognize that structural components are defined in section 1.48-1(e)(2), Income Tax Regs., to specifically include "plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and lighting fixtures * * *." Although we give great weight to respondent's regulations, we do not read the words "plumbing and plumbing fixtures" in a vacuum just as we did not read the words "electric wiring" in a vacuum in Scott Paper Co. v. Commissioner,supra at 183. We interpret the phrase of section 1.48-1(e)(2), Income Tax Regs., which reads "and other components relating to the operation or maintenance of a building" to be a "descriptive phrase intended to present the basic test used for identifying structural components." Scott Paper Co. v. Commissioner,supra at 183. As we stated in Scott Paper Co. v. Commissioner,supra at 183, "[i]tems which occur *564 in an unusual circumstance and do not relate to the operation or maintenance of a building should not be structural components despite being listed in section 1.48-1(e)(2), Income Tax Regs." We focus on petitioners' use of the drains in the kitchen and conclude that they do not relate to the general drainage of waste from the building but rather, drain wastes resulting from petitioners' food preparation activities. Despite the apparent character of the kitchen drainage as a permanent plumbing fixture, we conclude that it actually services petitioners' equipment and machinery [16] and is thus eligible for the credit as section 38 property. Electric Water Coolers.
Petitioners contend that they are entitled to the credit on the electric water coolers because the primary purpose of the coolers was to prevent employees from using glasses in the kitchen area where the risk of broken glass falling into the food would create a significant hazard. Petitioners argue that the water coolers do not serve a function relating to the operation or maintenance of the building. Respondent argues that the *565 electric water coolers provided water for petitioners' employees and were thus part of the building's overall plumbing system. Respondent argues that the water coolers related to the operation or maintenance of the building within the meaning of section 1.48-1(e)(2), Income Tax Regs. Respondent also emphasizes the permanent manner in which the water coolers were attached to the kitchen walls by brackets and bolts. We agree with respondent and conclude that water coolers constitute structural components because they are "plumbing and plumbing fixtures" which are structural components as defined in section 1.48-1(e)(2), Income Tax Regs. Petitioners' water coolers are permanently attached to the walls and do not service any of their specific machinery or equipment or provide an unusual service unique to petitioners' needs but rather relate to the operation or maintenance of the building. Chandeliers, Decor Wall Lights, Dimmers and Installation.
Petitioners contend that the chandeliers and decor wall lights were installed only for decorative purposes and they did not exist to provide general room illumination as there was ample *566 lighting throughout the cafeteria for such purpose. Petitioners conclude that the decorative lighting was not intended to and did not relate to the operation or maintenance of the building. Respondent contends that the "lighting fixtures" in a building are specifically defined in section 1.48-1(e)(2), Income Tax Regs., as being a structural component of a building. Respondent relies on Consolidated Freightways, Inc. v. Commissioner,708 F.2d 1385 (9th Cir. 1983), affg. in part and revg. in part 74 T.C. 768 (1980), in which it was held that lighting fixtures were structural components of a building. [17] In Consolidated Freightways, Inc. v. Commissioner,708 F.2d at 1390, the Court of Appeals for the Ninth Circuit reversed our determination that certain lighting fixtures were eligible for the investment tax credit. The Circuit Court concluded that the lighting fixtures in Consolidated Freightways functioned as an integral part of the taxpayer's loading docks and were designed to be a permanent feature of the docks. The Ninth Circuit emphasized that removal of the overhead doors and lighting fixtures *567 would detract significantly from the usefulness of the docks in the taxpayer's operations. There was no argument in Consolidated Freightways that the lights on the taxpayer's truck loading docks were decorative lighting fixtures and we consider this fact to distinguish that case from the instant case. [18]
*568 The chandeliers and decor wall lights used in petitioners' cafeterias were purely decorative fixtures which were designed specifically to compliment petitioners' decorative motif in specific cafeterias. The chandeliers and decor wall lights in issue used low wattage of 15 watt bulbs as compared to 150 or 75 watt bulbs which were used for the recessed lighting fixtures which are not at issue in this case. As stated in Senate Report No. 95-1263, "tangible personal property already eligible for the investment credit includes special lighting (including lighting to illuminate the exterior of a building or store, but not lighting to illuminate parking areas) * * *." 1978-3 C.B. (Vol. 1) at 415. We conclude that the chandeliers, decor wall lights, and dimmers constitute section 38 property because they constitute "special lighting," are assets accessory to petitioners' business, are readily movable and do not relate to the operation or maintenance of the building. The chandeliers and decor wall lights in issue were not the major source of light in the cafeteria and merely incorporated petitioners' decorative motif and complimented the interior design of its cafeterias.
*569 Petitioners are not entitled to a credit for installation of the chandeliers, decor wall lights or dimmers because installation is not "tangible personal property" or "other tangible property." Kitchen Hot Water Heater.
Petitioners contend that the hot water heater is "machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature * * * requirements which are essential for the operation of other machinery or the processing of * * * foodstuffs." Section 1.48-1(e)(2), Income Tax Regs. Petitioners argue that the hot water heater was installed solely because of the extensive hot water needs in the cafeterias. Petitioners argue that the hot water heater functions solely to supply the needs of their equipment and machinery in the cafeteria kitchens. Respondent contends that the hot water heater is an integral part of the building's plumbing system because it provides hot water for the kitchen operations as well as for the public and employee restrooms. Thus respondent concludes that the hot water heater functions in the operation or maintenance of the building and thus is a structural component *570 within the meaning of section 1.48-1(e)(2), Income Tax Regs. Respondent also contends that the hot water heater could be used by other tenants who may replace petitioners because the heater is adaptable to uses other than providing water for petitioners' kitchen operations. In addition, respondent notes that the hot water heater is connected to the plumbing system of the building through piping and is thus intended to remain permanently in place during the entire life of the cafeteria. In our view petitioners' sole justification for the installation of a kitchen hot water heater with a 300 or 400-gallon capacity was to meet the extensive hot water requirement for the operation of their kitchen machinery or equipment. Thus, we find that pursuant to section 1.48-1(e)(2), Income Tax Regs., petitioners' kitchen hot water heater meets the exception to the term "structural component" without further consideration of the inherent permanence test as established in Whiteco Industries.Piggly Wiggly Southern, Inc. v. Commissioner,84 T.C. 739, 753 (1985), on appeal (11th Cir. Dec. 23, 1985). Primary Electrical *571 Distribution System.
Petitioners filed claims for refunds claiming an investment tax credit for the percentage of the cost of the cafeterias' primary electrical distribution system they consider allocable to the service of cafeteria-related machinery and equipment. Petitioners determined the eligible percentage by measuring the electrical consumption in watts or kilowatts at the Williamsburg, Virginia, cafeteria. They determined that the percentage of kilowatt hours attributable to the electrical consumption necessary to power eligible machinery and equipment was 69.2 percent. They applied this percentage to the total electrical costs of $1,923,072 to arrive at a claim for investment tax credit of $1,330,766. From this figure, they subtracted the amount previously claimed of $630,882 to arrive at an additional amount claimed of $699,884. [19]
Petitioners support their allocation of the electrical distribution system between *572 the structural and processing-related functions on the basis of consumption of electrical power by citing Scott Paper Co. v. Commissioner,74 T.C. 137 (1980). In Scott Paper Co., we concluded that the components of the taxpayer's primary electric system which supplied the electric needs of process machinery rather than contributing to the overall operation or maintenance of buildings, was not an inherently permanent structure and the taxpayers were entitled to the investment tax credit on these components. In reaching this conclusion we placed great emphasis on the language in section 1.48-1(e)(2), Income Tax Regs., which defines "structural components" by listing examples and including as the last line of the regulation "and other components relating to the operation or maintenance of a building." In Scott Paper Co.,supra at 183, we characterized that phrase as follows: a descriptive phrase intended to present the basic test used for identifying structural components. The preceding elements are examples of items which meet that test as a general rule. Items which occur in an unusual circumstance and do not *573 relate to the operation or maintenance of a building should not be structural components despite being listed in section 1.48-1(e)(2), Income Tax Regs. * * * We also quoted the Technical Explanations of the Revenue Act of 1962 which explained the language which was incorporated in the regulation as follows: The term "structural components" of a building includes such parts of the building as central air-conditioning and heating systems, plumbing, and electric writing and lighting fixtures, relating to the operation [or] maintenance of the building. [H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 503, 516; S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 843, 859.] In accordance, we concluded that property fails to qualify for the credit if it relates to the overall operation or maintenance of a building rather than being used to aid in the employment of a particular function or particular piece of property. See Central Citrus Co. v. Commissioner,58 T.C. 365, 374 (1972). We focused on the ultimate uses of power at the taxpayer's facility in Scott Paper Co. and distinguished *574 the power used in the overall operation or maintenance such as lighting, heating, ventilation and air-conditioning of the building and the power used to operate the taxpayer's machinery. Scott Paper Co. v. Commissioner,supra at 183-184. We thus concluded in Scott Paper Co. that: To the extent that the primary electric carried electrical loads to be used for pulp and paper production processes or other such qualifying uses, the investment credit will be allowed for the primary electric improvements. To the extent that the primary electric improvements relate to the overall operation [or] maintenance of buildings, they are structural components of such buildings, and they do not qualify as tangible personal property. Central Citrus Co. v. Commissioner,58 T.C. 365 (1972); Ponderosa Mouldings, Inc. v. Commissioner,53 T.C. 92 (1969), sec. 1.48-1(c), Income Tax Regs. * * * [Scott Paper Co. v. Commissioner,supra at 186. Emphasis added.] Petitioners state that the investment tax credit was claimed only on the portion of the primary electrical distribution *575 system which is directly applicable to the operation of the machinery and equipment. Petitioners also add that subsequent tenants would have very little use for an electrical distribution system with 5 to 10 times the capacity that would be required for the operation or maintenance of a general purpose building. Respondent disallowed petitioners' claims for refund for the entire primary electrical distribution system of the cafeterias with the explanation that the system was a structural component of the buildings. [20] Respondent argues in the alternative, however, that if an allocation is made by this Court, petitioners' calculation of the amount eligible for the credit based on consumption is incorrect because the proper way to measure the electrical distribution system is on the basis of electrical load which is measured in terms of kilovolt-amperes. In respondent's view, electrical load directly relates to the cost of all other components of the system and is the primary means of measuring the capacity of a system. *576 Respondent takes the view that the electrical distribution systems constitute structural components of petitioners' cafeterias within the meaning of section 1.48-1(e)(2), Income Tax Regs.[21] Respondent adds that these systems are reasonably adaptable to other uses by petitioners or subsequent tenants and would not have to be replaced if the building was used for another activity. Respondent argues that section 1.48-1(e)(2), Income Tax Regs., specifically includes "electric wiring" in the definition of structural components. Respondent also cites Senate Report 1881, 87th Cong., 2d. Sess. 155 (1962), 1962-3 C.B. 703, 859, wherein structural components were defined to include electric wiring relating to the operation or maintenance of the building. Respondent also disputes the allocation of the electrical distribution system between qualifying and nonqualifying uses *577 of the electrical power. Respondent cites A.C. Monk & Co. v. United States,686 F.2d 1058 (4th Cir. 1982), to support his position. [22] Respondent argues that to the extent that Scott Paper Co. v. Commissioner,74 T.C. 137 (1980), held that a portion of the building's primary electrical system was allocable between qualifying and nonqualifying property, that case was in error. Specifically, respondent disagrees with the part of this Court's opinion in Scott Paper Co. wherein we determined a percentage use of the primary electrical distribution system for operation or maintenance of the building and a percentage for operation of the taxpayer's machinery and equipment. We then allocated the cost of the primary electrical distribution system between the two uses, and allowed investment tax credit for the percentage determined to be allocable to the operation of machinery. In respondent's view, no part of the primary electrical distribution system in issue is eligible for investment tax credit. *578 Respondent argues that the electrical distribution system in the instant case was designed to meet the electrical requirements of the cafeteria as a whole rather than just the kitchen requirements and the location and routing of the electrical components were planned to meet electrical power requirements petitioners might have from any source. The components of the electrical distribution system, in respondent's view, were installed to be permanent and removal would render the cafeteria building useless. Respondent points out that the reasonable adaptability of the electrical distribution system with minimal effort to accommodate another cafeteria, a restaurant or a retail sales establishment such as a furniture store, indicates that the system relates to the overall operation or maintenance of the building rather than relating to the function of specific pieces of kitchen machinery or equipment. Respondent recognizes that his argument is contrary to our holding in Scott Paper Co.,supra.Following our holding in Scott Paper Co. v. Commissioner,74 T.C. 137, 184 (1980), we focus on the ultimate use of the electrical power in petitioners' cafeterias in *579 order to determine whether the electrical distribution system constitutes a structural component. An allocation should then be made based on the qualifying and nonqualifying uses of the power. In Scott Paper Co. v. Commissioner,supra, we addressed whether the primary electric improvements to the taxpayer's pulp and paper-making plant qualifies as section 38 property. Rejecting the government's argument that the entire primary electric should be viewed as a structural component of the facility as a whole, we stated that "[t]he primary electric prosesses dual characteristics. It is a system that distributes electrical power to various parts of the facility, and yet, each component of the primary electric is individually responsible for the distribution of electrical power to the specific circuitry which is down the line from that component." 74 T.C. at 174. After noting that the taxpayer's business operations could not operate without the primary electric, we allocated between the structural and process functions served by the electrical components as follows: it is appropriate to break down the electrical load carried by the primary *580 electric in the same way as that of the secondary electric--by the amount of load caused by each category of consumptive device, i.e., lighting, ventilation, air-conditioning, process machinery, etc. Thus, it is appropriate to allow an investment credit for the primary electric improvements in a manner similar to that used by respondent with respect to the secondary electric improvements, i.e., by reference to circuit diagrams and electrical loads. To the extent that the primary electric carried electrical loads to be used for pulp and paper production processes or other such qualifying uses, the investment credit will be allowed for the primary electric improvements. To the extent that the primary electric improvements relate to the overall operation [or] maintenance of buildings, they are structural components of such buildings, and they do not qualify as tangible personal property. [Scott Paper Co.,supra at 185-186.] From the above it is clear that in Scott Paper Co. we allocated between the amount of the primary electric allocable to machinery and to building operations on the basis of the load carried to each. The parties have stipulated the load with respect *581 to machinery and with respect to the building in each cafeteria by stipulating the kilovolt-amperes applicable to each. We have set forth these stipulated figures in our findings. Since we have held the kitchen air makeup unit to be section 38 property, the stipulated figures including this unit are the appropriate figures to be applied to the cost of the various primary electric systems. In our view this method of allocation directly follows that held to be proper in the Scott Paper Co. case. Decision will be entered under Rule 155.
Footnotes
1. These deficienies result from disallowance of net operating loss carrybacks.↩
2. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue. ↩
3. After the parties reached an agreement on the eligibility of certain items with respect to which the investment credit was disallowed in the notices of deficiency, the credit with respect to the following items with the indicated expenditure remain in issue: Item
Expenditure
1. Emergency lighting
$95,967
2. Kitchen panel boards
116,850
3. Kitchen hand sinks
21,392
4. Kitchen water piping
189,214
5. Eliason doors
15,930
6. Restroom accessories
54,240
7. Decor window treatment
3,713
8. Lattice millwork
2,134
9. Vanity cabinets and counters
1,931
10. Customer line screen
111,422
11. Serving line concrete curb
12,406
12. Kitchen heat recovery unit
23,859
13. Cooler, freezer and garbage room floors
and the garbage room
149,094
14. Kitchen sanitary wall and floor tile
919,557
15. Kitchen air makeup unit
473,560
16. Kitchen drainage
364,977
17. Electric water coolers
15,287
18. Chandeliers, decor wall lights,
dimmers and installation
178,871
19. Kitchen hot water heater
60,734
20. Primary electrical distribution system
Petitioners filed claims for refunds for their expenditures for the primary electrical distribution systems in the total amount of $699,884. The refund claimed is 10 percent of this amount or $69,988.40.
*↩ 699,884
4. These corporations and their State of incorporation are as follows: ↩
Name
State of Incorporation
Morrison Inc.
Florida
Morrison of Savannah
Georgia
Morrison of Woodland Hills
Mississippi
Morrison of Tennessee
Tennessee
Morrison Cafeteria Co., Inc.
Alabama
Morrison of Columbia, S.C.
South Carolina
Morrison of Jefferson Parish
Louisiana
Morrison Support Co. of Georgia
Georgia
Morco Industries
Florida
Morrison Food Services of Va.
Virginia
5. Petitioners did not claim investment tax credit for their primary electrical distribution system on their tax returns, but some have filed claims for refund claiming investment tax credit on the primary electrical distribution system. The investment tax credit for the primary electrical distribution system as claimed by petitioners are for the years and in the amounts as follows: ↩
Name
Year Ending
Amount
Morrison Incorporated
May 28, 1977
$19,315
June 3, 1978
31,415
Morrison of Woodland Hills
May 28, 1977
June 3, 1978
40
Morrison of Tennessee
June 3, 1978
5,707
Morrison Cafeteria Co.
June 3, 1978
2,771
Morrison of Columbia, S.C.
June 3, 1978
6,458
Morrison of Jefferson
Parish
May 31, 1976
11,963
June 3, 1978
Morrison of Virginia
May 28, 1977
2,639
June 3, 1978
Morrison of Savannah
May 28, 1977
2,462
*. These figures differ from amounts in issue as stated on original stipulation because of elimination of amounts attributable to Goldsboro N.C. unit.↩
6. The percentages will change depending upon our determination of whether the kitchen air makeup unit qualifies for investment tax credit.↩
7. Respondent allowed the investment tax credit with respect to the circuit breakers and wires directly leading to these appliances.↩
8. See Duaine v. Commissioner,T.C. Memo. 1985-39. A credit was allowed in Duaine for a restaurant's gas, plumbing and electrical fixtures that did not relate to general building services such as lighting, heating or ventilation. All the fixtures in issue directly serviced the taxpayer's equipment and machinery. Therein we also cited Rev. Rul. 66-299, 1966-2 C.B. 14, 16, which specifically states that-- special electrical or plumbing connections which are necessary to and are used directly with a specific item of machinery or equipment, or between specific items of individual, machinery or equipment, are not structural components of the building, but are essentially items of machinery or equipment, and qualify as section 38 property for investment credit purposes.↩
9. Respondent states that his position is supported by Mallinckrodt, Inc. v. Commissioner,T.C. Memo. 1984-532, affd. per curiam without published opinion (8th Cir. 1985), and Dixie Manor, Inc. v. United States, an unreported case ( W.D. Ky. 1979, 47 AFTR 2d 81-1298, 79-2 USTC par. 9469), affd. without published opinion 652 F.2d 57 (6th Cir. 1981). In Mallinckrodt, Inc, v. Commissioner,supra, we addressed whether gypsum drywall partitions used in office buildings qualified for the investment tax credit. The partitions divided the interior of the buildings into offices or utility space and were not capable of being removed or reused in their entirety or being stored as a unit. We concluded that the partitions were structural components due to their permanent nature. The facts in the Mallinckrodt case are totally distinguishable from those in the instant case. In Dixie Manor, the Court addressed whether four partitions installed by a music company occupying space in a shopping center qualified as section 38 property. One of the items was drywall on wood studs, and some walls had paneled wainscoting and others were full-ceiling height in the restrooms. The District Court concluded that the partitions constituted structural components due to their permanent manner of attachment and the fact that the partitions were not readily movable. The facts in the Dixie Manor↩ case are also distinguishable from the facts in the instant case.
10. Respondent cites Duaine v. Commissioner,T.C. Memo. 1985-39, to support his position that the concrete curb constitutes a structural component ineligible for the credit. In Duaine, the taxpayers claimed an investment tax credit for a portion of the Taco Bell restaurant's concrete foundation slab located behined the counter. We held in Duaine↩ that the underlying concrete foundation slab, although slightly modified for design considerations, was clearly a structural component of the building.
11. Respondent relies on Duaine v. Commissioner,T.C. Memo. 1985-39↩, in which we held that wall and floor tiles in the taxpayer's restaurant food preparation, refrigeration, storage and loading areas constituted a permanent covering for the restaurant's walls and floors and hence constituted structural components ineligible for the investment tax credit.
12. Respondent cites Circle K Corp. v. Commissioner,T.C. Memo. 1982-298, in which this Court held that a cold storage room constructed to store ice in an ice manufacturing plant constituted a building and did not qualify for the credit. In Circle K. Corp., the taxpayer operated an ice manufacturing plant and constructed an addition which was a cold storage room. We held that the taxpayer was not entitled to the investment tax credit on this cold storage room because of its failure to prove that it was necessary to place the ice in a cold storage room for 24 hours in order to complete the manufacturing process. This proof was necessary to show that cold storage of the ice for a 24-hour period was an integral part of the manufacturing process as required in section 1.48-1(d)(4), Income Tax Regs.↩
13. Respondent again cites Duaine v. Commissioner,T.C. Memo. 1985-39↩, to support his position. In that case we held that the wall and floor tiles in the food preparation, refrigeration, storage and loading areas of a restaurant constituted structural components of the building because the tiles are permanently glued to the restaurant's walls and floors.
14. See Rev. Rul. 81-240, 1981-2 C.B. 11; Rev. Rul. 75-77, 1975-1 C.B. 7↩.
15. Respondent attempts to distinguish Duaine v. Commissioner,T.C. Memo. 1985-39, in which we held the connectors between the taxpayer's restaurant equipment and the drainage system to be tangible personal property. The drainage system itself was not at issue in Duaine. In Duaine, the taxpayers claimed an investment tax credit for the plumbing and gas fixtures connecting the Taco Bell restaurant equipment to incoming utility "stub-outs," electrical outlets and conduit providing localized power sources for their equipment, the drain line connecting the taxpayers' refrigerators and sinks to the building drains, and the water lines providing water from the water mains to steam trays, cooking vessels and ice machines. In Duaine, we applied the test from Scott Paper Co. v. Commissioner,74 T.C. 137 (1980), and concluded that the restaurant's gas, plumbing and electrical fixtures did not relate to general building services such as lighting, heating and ventilation, which involved the operation or maintenance of a building but to the operation of the taxpayers' equipment and machinery. Respondent attempts to distinguish Duaine on the ground that the drainage system itself was not at issue in that case. We do not agree with respondent that the Duaine↩ case is distinguishable from the instant case with respect to the drains.
16. See Rev. Rul. 66-299, 1966-2 C.B. 14↩.
17. Respondent also relies on Duaine v. Commissioner,T.C. Memo 1985-39, in which the taxpayer claimed an investment tax credit for the interior and exterior ornamental light fixtures of the Taco Bell restaurant. We held in Duaine↩ that the taxpayer's contention that the ornamental lighting fixtures were purely decorative was not supported by the record and we concluded that the interior and exterior lighting fixtures provided the only artificial lumination in the customer easting area and along the walkways to the buildings. We held that the interior and exterior lighting fixtures constituted structural components of the restaurant and related to the operation or maintenance of the building housing the restaurant. We stated that the ability of the restaurant's designer to camouflage the standard lighting requirements by incorporating the restaurant's motif into their appearance did not warrant a contrary conclusion.
18. In Shoney's South, Inc. v. Commissioner,T.C. Memo. 1984-413, this Court held that chandeliers and hanging lanterns used in the taxpayer's restaurant did not relate to the operation or maintenance of the building but were designed specifically for decorative use in the restaurant and enhanced its atmosphere. The chandeliers could be removed from one location and shipped to another if needed. Removal did not damage the chandeliers or lanterns. They were replaced on the average of every 5 to 7 years either in connection with general remodeling or with installation of new salad or breakfast bars. After applying the permanency test of Whiteco. Industries, Inc. v. Commissioner,65 T.C. 664, 672-673 (1975), we concluded that the chandeliers and lanterns were not reasonably permanent and that they were assets accessory to the taxpayer's business, S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 722, rather than components relating to the operation or maintenance of the building in which they were located. Petitioners' chandeliers and decor wall lights serve the same function as those in Shoney's South.↩
19. Petitioners add that if we determine that the kitchen panel boards are eligible for the credit, then the cost attributable to the kitchen panel boards will be subtracted from the cost of the secondary electric before the 69.2 percent is applied.↩
20. Respondent did not disallow the credit claimed in the tax returns for the part of the electrical distribution system that connects directly to petitioners' kitchen machinery and equipment. This includes the cost of the wiring, conduit and circuit breakers by which the machinery and equipment is actually connected to the electrical distribution system.↩
21. Respondent states on brief that if an allocation is made, a credit should only be allowed for the primary electric because it serves a dual function--the operation or maintenance of the building and the operation of the machinery and equipment.↩
22. The Fourth Circuit in A.C. Monk & Co. v. United States,686 F.2d 1058 (4th Cir. 1982), held that the proper approach is to determine whether the electrical system has more general uses than special uses for operating items of machinery and, if so, the system is a structural component of the business and hence nonqualifying. Any appeal in this case will lie in the Eleventh Circuit, so we need not reexamine our holding in the Scott Paper Co.↩ case at this time.